# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 05, 2014 Session

## STATE OF TENNESSEE V. DEWOYNE GWYNN

**Appeal from the Criminal Court for Shelby County**
**No. 1101634     John T. Fowlkes, Jr., Judge**

—————

**No. W2012-01865-CCA-R3-CD  - Filed August 29, 2014**

—————

Defendant, Dewoyne Gwynn, and two co-defendants, Ms. Chronda Walker, and Mr. Markhayle Jackson, were charged in a six-count indictment with (1) premeditated first degree murder of Kelvin Cooper; (2) felony murder of Kelvin Cooper during the perpetration of kidnapping; (3) felony murder of Kelvin Cooper during the perpetration of robbery; (4) especially aggravated kidnapping of Kelvin Cooper by use of a deadly weapon; (5) especially aggravated kidnapping of Kelvin Cooper wherein the victim suffered serious bodily injury; and (6) especially aggravated robbery of Kelvin Cooper. Defendant was tried by himself in a jury trial. The jury acquitted Defendant of all three counts of first degree murder and of especially aggravated robbery. On each of the two remaining counts, the jury convicted Defendant of the lesser included offense of facilitation of especially aggravated kidnapping. At sentencing the trial court merged the two convictions and sentenced Defendant to serve twelve years' incarceration. Defendant raises three issues on appeal; (1) the evidence was insufficient to support the conviction of facilitation of especially aggravated kidnapping; (2) the trial court failed to properly charge the jury; and (3) the trial court erred in sentencing Defendant. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Dewoyne Gwynn.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; Raymond Lepone and Jennifer Nichols, Assistant District Attorneys General, for the appellee, the State of Tennessee.

# OPINION

## FACTS

*Summary of Facts*

Ms. Walker, Mr. Jackson, and Defendant were living in an apartment in Memphis. Ms. Walker had, at various different times, intimate relationships with Defendant, with Mr. Jackson, and with the victim. On December 14, 2009, the victim sent a text message to Ms. Walker asking her to have sex with him. Mr. Jackson saw the message and became angry. He caused the victim to be lured to the apartment by Ms. Walker under the pretext that Ms. Walker was going to have sex with the victim.

When the victim arrived, he was assaulted and robbed by Defendant and Mr. Jackson. Ultimately, the victim was forced into the trunk of his own vehicle. With Defendant driving, he and Mr. Jackson took the victim a short distance. Mr. Jackson poured gasoline in the passenger section of the vehicle, and Mr. Jackson opened the trunk and poured gasoline all over the victim. Mr. Jackson then lit a piece of paper and set the victim and the car on fire. Defendant and Mr. Jackson ran away. The victim was taken to a hospital where he died a few hours later from being burned over eighty percent of his body. Mr. Jackson had been armed with a gun during the initial assault on the victim, and cash money and a cell phone were taken from the victim during the assault. At Mr. Jackson's instructions, Defendant took possession of the gun in order to get rid of it.

According to the record, Mr. Jackson was subpoenaed to testify at Defendant's trial, but he refused to testify. In a jury-out hearing regarding his refusal to testify, Mr. Jackson acknowledged that he had "pled guilty and received a sentence of life without parole" a few weeks prior to Defendant's trial. Ms. Walker testified during the State's case-in-chief against Defendant. The crux of Defendant's insufficient evidence argument is that the conviction for facilitation of especially aggravated kidnapping "is unconstitutionally inconsistent with the acquittals based upon the same defense [of duress]." We will discuss below well-settled law that this argument is without merit. Keeping in mind that the evidence must be viewed in the light most favorable to the State, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), we are setting forth in this opinion those facts which show that the State met its burden to prove Defendant's guilt of facilitation of especially aggravated kidnapping beyond a reasonable doubt.

*Evidence at Trial*

In a signed written statement given to two Memphis Police officers, Defendant admitted that he and Mr. Jackson were involved in an especially aggravated robbery of the victim. Defendant stated that Mr. Jackson was armed with a butcher knife. Defendant continued his explanation of the incident by saying that when he arrived at the house, the victim and Mr. Jackson were having an argument. Defendant stepped between the two men, and Defendant hit the victim after Defendant was pushed by the victim. Defendant said the victim fell after Mr. Jackson struck him. Defendant kicked the victim. Defendant said that Mr. Jackson told the victim to pull out his wallet, which the victim handed to Mr. Jackson. Mr. Jackson removed "a nice little wad of money." Defendant said that Mr. Jackson made the victim remove all his clothing and that Mr. Jackson "aggressively" beat the victim. Defendant stated that Mr. Jackson threatened Defendant with a knife while Mr. Jackson told Defendant "How I know you're not going to snitch?"

Defendant explained how Mr. Jackson retrieved a gas can out of a closet, told the victim to get dressed, walked the victim to the victim's car and ordered the victim to get into the trunk. As per instructions from Mr. Jackson, Defendant drove the victim's car "to the spot he [Mr. Jackson] told me to." Defendant said that Mr. Jackson poured gasoline in the passenger compartment of the car and opened the trunk and doused the victim with gasoline. Mr. Jackson lit a piece of paper and used it to set the car and the victim on fire. Defendant said he ran away at this point.

Defendant said he guessed that he realized Mr. Jackson had set the fire "because I [Defendant] heard the victim screaming." Defendant described his own conduct immediately after the victim was set on fire as follows:

> I ran back to the apartment. I came in. It was about 4:00 something, so I put on my work clothes, and I came out. [Mr. Jackson] was counting the money. He asked me did I want any. I told him I was straight. Then he was like, "Guess what else I got" and he pulled out the victim's cell phone. I went in the kitchen and got a glass of Kool-Aid and [Mr. Jackson] was like - started walking around back and forth. Then I went to work.

In other portions of his signed statement, Defendant said that Ms. Walker knew Defendant and Mr. Jackson were beating the victim but did not know they were robbing him. Defendant also stated the reason he participated in the robbery: "I say it was anger because [of] my emotions. [The victim] called out my name and pushed me."

Ms. Chronda Walker testified on behalf of the State. She testified that at one time the victim was her boyfriend. She was also dating a man named James Jackson during the same time period. Subsequently, just after her 22nd birthday in 2008, Defendant, who was seventeen years old, also became a boyfriend of Ms. Walker. In November 2009, Ms. Walker and Defendant moved into an apartment together. However, prior to this, Ms. Walker also began a boyfriend/girlfriend relationship with Markhayle Jackson in August 2009. Ms. Walker testified that she was "technically" engaged to Defendant during the time she was dating both Defendant and Markhayle Jackson. She said Defendant knew she was also dating Markhayle Jackson; however, Markhayle Jackson was not aware that she was still dating Defendant.

On the day of the crime, Ms. Walker woke up in her apartment at 11:00 a.m. Markhayle Jackson was talking on her phone with the victim. Mr. Jackson was arguing and "going off." Mr. Jackson said he was going to "whoop [the victim's] ass." Mr. Jackson accused Ms. Walker of sleeping with the victim. Ms. Walker told Mr. Jackson that she did not care what Mr. Jackson did and that she just wanted to be left alone. Ultimately, Mr. Jackson handed Ms. Walker the phone and told her to get the victim to come to the apartment. She complied and called the victim. She told him that she was not feeling well and asked the victim to bring her some orange juice.

When the victim arrived, Defendant was inside the apartment's bedroom closet. Mr. Jackson was inside the bathroom. Ms. Walker and the victim were having a conversation in the apartment's living room when Mr. Jackson came into the room and pointed a rifle at Ms. Walker. Mr. Jackson ordered her to go inside the bedroom. When she got there, she told Defendant that Mr. Jackson was "trippin'." Defendant went into the living room and promptly returned to close the bedroom door and told her to stay inside the bedroom.

Later, Ms. Walker stepped into the living room and saw the victim on his knees. Mr. Jackson had the gun and was standing in front of the victim. Defendant was standing at an angle behind the victim. She saw Mr. Jackson strike the victim in the face. The victim fell on his side and began moaning. Ms. Walker returned to the bedroom for a period of time and then came back into the living room. She observed both Defendant and Mr Jackson "kicking and stomping" the victim. Defendant was kicking the victim's lower back and legs and Mr. Jackson was kicking the victim's face and upper body. The victim was pleading for Defendant and Mr. Jackson to stop. She saw Defendant kick the victim three or four times.

Mr. Jackson left the apartment, and Defendant returned to the bedroom and got clothes out of the closet. The victim was still in the living room. When Mr. Jackson returned, he told Defendant to come out of the bedroom, and Defendant complied. Ms. Walker could see into the living room, and she observed the victim in quite a bit of distress

lying on his stomach. Mr. Jackson was questioning the victim. Defendant was in front of the victim squatted against the wall. At one point, Defendant picked up a knife while he was in front of the victim, and at the same time Mr. Jackson hit the victim in the face with the rifle.

Defendant, Mr. Jackson, and the victim left the apartment. Twenty to thirty minutes later Defendant returned. Mr. Jackson returned about five minutes later. She asked Defendant about the victim, and Defendant said "on fire." Shortly thereafter Defendant began to get ready to go to his job. Mr. Jackson told Defendant he needed to get rid of the rifle, and Defendant replied, "I got you." Ms. Walker left the apartment with Defendant.

After Defendant, Mr. Jackson, and the victim had left the apartment, Ms. Walker cleaned up blood from the carpet and gathered the victim's personal papers which had been left on the floor. She threw away the victim's papers and the towel she had used to clean up the victim's blood. Ms. Walker admitted that she had told police officers that the reason she told the victim to come to her apartment was to set him up to be assaulted by Defendant and Mr. Jackson. She also admitted that while Defendant and Mr. Jackson were punching the victim, Defendant came to her and asked for her scarf. She told police that the scarf was for wrapping around he victim's mouth, but she believed it had actually been used to tie up the victim's hands.

Ms. Walker testified that after the victim had been burned, and after Defendant had returned to her apartment, she drove Defendant to a third person's home where the third person received the gun used by Mr. Jackson. She further testified that she then drove Defendant to his place of employment.

Hope Smith, an officer in the Memphis Police Department's crime scene unit, testified about the crime scene at the apartment where Ms. Walker, Mr. Jackson, and Defendant resided. After arrival and examination of the scene on December 14, 2009, she observed marijuana, cash, a spot on the carpet that appeared to be blood, and dirty clothes on the floor of a bathroom. A pair of jeans was included in the clothes on the bathroom floor. The jeans had an odor of gasoline. A white tank top among the clothes also smelled like gasoline.

Sergeant Chris Vaden of the Memphis Police Department testified that he took part in the investigation of the victim's death. Sergeant Vaden was assigned to take a statement from Defendant. Detective Simpson (no first name provided) also participated in taking Defendant's statement. After waiving his rights under the Fifth Amendment to the U.S. Constitution, Defendant responded to Sergeant Vaden's request to describe the events leading up to the victim's death. Defendant stated that he came home to find the victim and Markhayle Jackson in an argument. Defendant placed himself between the two men. The

victim pushed Defendant. In response, Defendant punched the victim and the victim went down to his knees. At that point, Markhayle Jackson and Defendant began beating the victim. Defendant stated that Markhayle Jackson obtained a butcher knife and stabbed the victim in the shoulder. After that the victim was placed in the trunk of the vehicle and Defendant and Markhayle Jackson took the vehicle to a lot. Defendant said that Markhayle Jackson opened the trunk, poured gasoline on the victim and then set a piece of paper on fire and threw it on the victim. Defendant told Sgt. Vaden that he (Defendant) went back to the apartment, had a discussion with Markhayle Jackson and Ms. Walker, and then Defendant put on his work uniform because it was time for him to go to work at a McDonald's restaurant.

Defendant's statement to police was reduced to writing in a question/answer format. The written statement was read to the jury. Information from Defendant's statement in addition to what was described by Sergeant Vaden's testimony, is as follows. Defendant did not possess a weapon during the robbery of the victim. Defendant stated that as far as he knew only money was taken from the victim, and Defendant received none of the money. Defendant stated that he only kicked the victim one time after he fell on the floor. Defendant stated that Markhayle Jackson took the victim's money, continued to beat the victim, and ordered the victim to take off his clothes. After the victim had stripped off his clothes, Markhayle Jackson began to beat him more aggressively. Markhayle Jackson stated he was "fixing to have fun" with the victim. Markhayle Jackson went to a closet and got a gas can. Defendant stated that he told Markhayle Jackson he was "pushing it too far." Markhayle Jackson said he was "fixin' to end this." Defendant stated that he told Markhayle Jackson that Markhayle had taken the victim's money and asked Markhayle what else Markhayle was trying to get from the victim.

Defendant stated that Markhayle Jackson waived the knife at Defendant and said "How [do] I know you're [Defendant] not going to snitch?" At that point Markhayle Jackson ordered the victim to get dressed, the victim was walked to the car, and the victim got into the trunk upon Markhayle Jackson's command to do so. Defendant drove the car, with Markhayle Jackson as a passenger, to the location given by Markhayle Jackson. When they stopped, Defendant and Markhayle Jackson got out of the vehicle, and Markhayle opened the trunk, poured gasoline on the victim, and then set him on fire. Defendant stated that he was walking off and then ran away. Defendant stated that he went back to his apartment and changed clothes to go to work. Markhayle Jackson offered Defendant some of the money taken from the victim, but Defendant declined. In pertinent questioning in the statement the following exchanges took place:

> Q: Did [Ms. Walker] know that you and [Markhayle Jackson] were robbing the victim?

-6-

[DEFENDANT]:    I know she knew that we were beating [him]; but I don't think she knew that we were robbing him.

* * *

Q:    Why did you participate in this robbery?

[DEFENDANT]:    I don't know why. I say it was anger because it was my emotions. He [the victim] called out my name and pushed me.

Brian Clements, who resided in a condominium in the complex where the victim and his car were burned, testified that he saw that vehicle parked in the middle of the street of the complex just before it burned. Mr. Clements was driving to his home. He identified Defendant as the person who got out of the vehicle from the driver's seat. Defendant had to partially close the driver's door to allow Mr. Clements to drive by it. Mr. Clements saw smoke rising from where he had seen the victim's vehicle about ten minutes later when he took the trash outside.

Alfredo Freeman testified that he had known Defendant through their employment at the McDonald's restaurant for about a year at the time of the victim's death. On that same day Defendant called Mr. Freeman and said he needed a favor from Mr. Freeman. Defendant came to Mr. Freeman's house with Ms. Walker. Defendant gave Mr. Freeman a rifle wrapped in a blanket and asked Mr. Freeman to hold it for him. A police officer called Mr. Freeman the next day, and Mr. Freeman went to the police station and gave a statement. The gun, which was hidden in a closet, was turned over to police.

Dr. William Hickerson testified that he is a board-certified physician in both general surgery and plastic surgery. Ninety percent of his medical practice is devoted to medical care for patients who have been burned. He treated the victim, who had been burned over eighty percent of his body. The victim also had a severe inhalation injury to his lungs. At the time of his arrival at the trauma unit, the victim's injuries caused a prognosis with a ninety-eight percent mortality rate. Despite medical efforts to save his life, the victim died as a result of the burning and inhalation from "multi-organ failure with cardio-pulmonary arrest."

Dr. Karen Chancellor, the chief medical examiner for Shelby County, testified that she performed an autopsy of the victim. In addition to obvious burn injuries, she also found evidence of blunt force trauma to the victim's head on the left frontal scalp and on the muscles above each ear. The injuries indicated multiple blows to the victim's head. Dr. Chancellor stated that in her expert opinion the cause of the victim's death "resulted from the

thermal or burn injuries . . . and from the inhalation of smoke during the fire," with the manner of death being a homicide.

Defendant testified in his own defense. He described an incident when Markhayle Jackson threatened to kill Defendant, and/or Ms. Walker and/or the baby if Defendant did not quit dating Ms. Walker. This was prior to the day of the victim's death and was after Markhayle Jackson began dating Ms. Walker. Also, Defendant testified that Markhayle Jackson made the following statement to Defendant while Markhayle Jackson was beating the victim: "Okay. If anybody - if you go tell somebody something happened, I'm gonna kill you, or I'm gonna kill her [Ms. Walker], or somebody else close to you."

Defendant testified that Markhayle Jackson then got a gas can and left the apartment. He returned to the apartment about five minutes later, but he did not bring the gas can back inside the apartment. Markhayle Jackson got the gun he had previously used to hit the victim and told the victim "to come on." Markhayle Jackson then told Defendant, "you gonna drive - you coming too." The three men walked to the victim's car and Markhayle Jackson made the victim get inside the trunk. Markhayle Jackson told Defendant to drive the vehicle around a loop in the apartment complex while Markhayle Jackson left for a few minutes. Markhayle Jackson returned and told Defendant directions to drive the vehicle, with Markhayle Jackson inside the vehicle. Defendant drove into a condominium complex and stopped the car at Markhayle Jackson's command. Defendant and Markhayle Jackson got out of the car and Markhayle Jackson began pouring gasoline on the front seat. Defendant confirmed Mr. Clement's testimony about driving around the stopped car. Defendant moved to a point "far off - I was like five steps off the car." Markhayle Jackson took the keys from the ignition, opened the trunk, and pulled out a small piece of paper. Defendant testified that was when he started running away from the car, and Defendant heard a man scream. Defendant ran to his apartment and began packing clothes. When he came out of the bedroom, he saw Markhayle Jackson and Ms. Walker on the patio. Markhayle Jackson began telling about setting the fire and, according to Defendant, went on "a little bragging spree." Defendant testified that he got dressed for work and that Markhayle Jackson reminded Defendant of the prior threat and told Defendant to get rid of the gun.

As to his statement given to police, Defendant testified that some of what is contained therein is not true. Specifically, Defendant denied that he said he kicked the victim. He also denied that he told the officer that he "participated" in the especially aggravated robbery of the victim. Defendant also said it was not true that he told the officer interviewing him that "I know she knew that we were beating him; but I don't think that she knew that we were robbing him." Defendant admitted during cross-examination that he had taken the rifle from the crime scene wrapped in a blanket and delivered it to Mr. Freeman.

Several other witnesses testified. We have reviewed their testimony, but a summarization of their testimony is not necessary to address the issues raised by Defendant.

## ANALYSIS

In both count 4 and count 5, the jury found Defendant guilty of the lesser included offense of facilitation of especially aggravated kidnapping. The trial court merged the two convictions and sentenced Defendant to serve twelve years' incarceration. Defendant was acquitted of all other charges.

In his first issue, Defendant asserts that there was insufficient evidence to sustain his conviction for facilitation of especially aggravated kidnapping. His argument is as follows. Defendant asserted the defense of duress, codified at Tennessee Code Annotated section 39-11-504, at his trial as to all charged offenses. Defendant argues, therefore, that his conviction for the two (later merged) counts of facilitation of especially aggravated kidnapping "is unconstitutionally inconsistent with the acquittals based upon the same defense." Defendant does not cite any case law or statutory law in support of this argument.

In *Wiggins v. State*, 498 S.W.2d 92 (Tenn. 1973), our supreme court held as follows concerning the situation of "inconsistent verdicts:"

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*Id*. at 93-94.

The jury found Defendant guilty of one count of facilitation of especially aggravated kidnapping by false imprisonment accomplished with a deadly weapon and one count of facilitation of especially aggravated kidnapping by false imprisonment where the victim suffered serious bodily injury. "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). As pertinent in this case, especially aggravated kidnapping is "false imprisonment, as defined in [T.C.A.] § 39-13-302: (1) Accomplished with a deadly weapon . . . or (4) where the victim suffers serious bodily

injury." Tenn. Code Ann. § 39-13-305(a)(1) and (4). Tennessee Code Annotated section 39-11-403(a) provides that,

> A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [T.C.A.] § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are question primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S .W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. " A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Taken in the light most favorable to the State, the proof showed that Defendant lacked the intent required to be criminally responsible for the especially aggravated kidnapping of the victim. Defendant, in his statement, said that he told Markhayle Jackson that Mr. Jackson was "pushing it too far," that is, going beyond taking the victim's money, and thus encouraged Mr. Jackson to not do anything more to the victim. However, the proof also showed that a knife and a rifle were used by Mr. Jackson to stab and strike the victim. Mr. Jackson left the apartment for a short period of time to obtain gasoline, while Defendant stayed at the apartment with the victim. Defendant accompanied Mr. Jackson in walking the victim to his own car and observed Mr. Jackson order the victim to get into the trunk. Defendant drove the vehicle with the victim locked in the trunk to the location where Mr. Jackson ultimately set fire to the car and the victim. The victim died from the severe injuries caused by the fire. The proof of Defendant's guilt was overwhelming. Defendant is not entitled to relief on this issue.

In his second issue, Defendant argues that the trial court erred by denying his request for the following jury charge: "That the Defendant was under no legal duty to assist the victim." Defendant has cited no legal authority in his brief in support of this precise issue. Defendant's only citation to the record in support of this issue is a reference to the twenty-five pages of the trial transcript containing the State's rebuttal closing argument to the jury. As correctly noted by the State in its brief, Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires an appellant to include in his brief citations to legal authorities and appropriate references to the record for each issue. Furthermore, Rule of the Court of Criminal Appeals of Tennessee 10(b) states: "Issues which are not supported by argument,

citation to authorities, or appropriate references to the record will be treated as waived in this court." Defendant has waived this issue.

In his final issue, Defendant asserts that the trial court erred by imposing the maximum allowed sentence of twelve years as a Range I standard offender for a Class B felony. Defendant's entire argument as it relates to what he asserts is in the appellate record is as follows:

> In the case at bar the trial court found no mitigating factors, while finding several aggravating factors. (Sentencing Transcript, pp. 6- pp. 41). The appellant had very little criminal history and had a long work history despite his young age. Furthermore, the trial court did not utilize the sentencing factors as required, but instead sentenced the appellant to the maximum sentence because he was acquitted of the more severe charge of capital murder. *State v. Givens*, Lexis 547 [sic] (Tenn. Crim. App. June 28, 2002).

Defendant's citation to "*State v. Givens* is obviously incomplete. The full citation is *State v. Willie Givens*, No. M2000-02883-CCA-R3-CD (Tenn. Crim. App. June 28, 2002). Defendant does not cite to any specific ruling by this Court in *Willie Givens*, and after reviewing the opinion, we are unable to find anything to support Defendant's argument. Furthermore, Defendant's argument relies upon case law that is prior to our supreme court's opinion in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The standard of review of a trial court's decision as to the length of a sentence is an abuse of discretion standard with a presumption of reasonableness when the trial court's decision reflects proper application of the purposes and principles of Tennessee's sentencing statutes. *Id*. at 707.

Defendant does not specify that the trial court improperly applied any sentencing factor(s). He merely argues that the trial court "did not utilize the sentencing factors as required"and sentenced Defendant to the maximum sentence of twelve years "because [Defendant] was acquitted of the more severe charge of capital murder." Again, Defendant does not cite to anything stated by the trial court that would even remotely support this assertion. We have found nothing in the record to support this allegation. Our review of the trial court's ruling reveals that the trial court's decision was clearly in conformity with *Bise*. The sentence is appropriate, and Defendant is not entitled to relief on this issue.

Accordingly, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-12-